J-A30006-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KEVIN BENNETT | |
| Appellant | No. 1486 EDA 2013 |

Appeal from the Judgment of Sentence April 24, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003607-2011

BEFORE: LAZARUS, J., MUNDY, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JANUARY 30, 2015**

Kevin Bennett appeals from the judgment of sentence, imposed by the Court of Common Pleas of Philadelphia County, after a jury convicted him of first-degree murder[1] and related offenses. Upon careful review, we affirm.

The trial court summarized the facts of the case as follows:

At trial, eyewitnesses Caleb Jackson and Jerry Holloman, the medical examiner and numerous police officers testified for the Commonwealth. Kim Fries testified for the defense.

Caleb Jackson testified that he was living at 2115 Gould Street in Southwest Philadelphia in October of 2010. The block on which Jackson lived had numerous abandoned properties and crack houses. Jackson, who was a self-professed drug addict at the time, stated that he routinely rented rooms in his house to persons who wanted to either use drugs or engage in

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

prostitution. These persons gave Jackson money or drugs for the use of his home.

In the early morning hours of October 4, 2010, Jackson came out of his home and motioned to [Bennett] and Christopher Lewis, who were standing across the street. According to Jackson, [Bennett] and Lewis sold drugs. Jackson was attempting to buy drugs from them on behalf of a person or persons inside his home. Jackson went back inside to wait for the drugs to be delivered. Several minutes later, Jackson went outside to see where [Bennett] and Lewis were. He noticed that they had moved further down the street. Jackson again motioned to [Bennett] and Lewis, but they did not respond.

At that point, Jackson saw the decedent, Dominic Young, walking down Gould Street. Young lived on Gould Street and often sold drugs to others on the block. Young asked Jackson what he needed, and Jackson told him he wanted to buy crack. Jackson then went inside while Young went to retrieve the drugs. When Jackson emerged from his house moments later, he saw Young standing outside. According to Jackson, [Bennett] walked up behind Young, pulled out what he believed to be a gun, and shot Young point blank in the back of the head. Young immediately fell to the ground, mortally wounded.

Jerry Holloman, who lived in the area and sold marijuana on Gould Street, was also present when the shooting occurred. Holloman testified that [Bennett] and Lewis were selling drugs on Gould Street on the night of the shooting, and that [Bennett] and the decedent had a brief argument. According to Holloman, [Bennett] pulled out a gun, pointed at the back of decedent's head and fired a single shot. Holloman ran away after the shooting occurred, but returned moments later. He was initially reluctant to speak with police, but eventually gave homicide detectives a statement in which he positively identified [Bennett] as the shooter.

[Bennett] immediately fled the area after the shooting. On December 9, 2010, detectives from the Philadelphia Fugitive Task Force, U.S. Marshals and local police apprehended [Bennett] in Smyrna, Delaware. [Bennett] gave police a false name when he was arrested.

The defense argued that someone other than [Bennett] was the shooter. In support of this claim, the defense called Kim Fries. Fries testified that she had lived on the 2100 block of Gould

Street, and had known [Bennett] for several months when the shooting occurred. Fries stated that shortly after midnight on October 4, 2010 she heard a single gunshot. When she looked outside, she saw an unknown person wearing a black hoodie run past her home. Fries could not tell whether the person was male or female or what their race was. Nevertheless, Fries testified that she was certain that the identified person was not [Bennett].

Trial Court Opinion, 1/6/14, at 2-4.

On April 23, 2012, a jury convicted Bennett of first-degree murder, possessing an instrument of crime (PIC),[2] and violating the Uniform Firearms Act (VUFA).[3] The following day, the court sentenced Bennett to life imprisonment for first-degree murder and concurrent sentences of 2½ to 5 years for the additional offenses.

Bennett filed post-sentence motions, which the court denied by order dated May 7, 2012. However, because the order was not served upon Bennett or his counsel, Bennett did not file a timely appeal from his judgment of sentence. On September 19, 2012, he filed a PCRA petition requesting reinstatement of his appellate rights *nunc pro tunc*. The trial court granted relief on May 14, 2013, and this timely appeal followed, in which Bennett raises one issue for our review:

Did not the trial court abused its discretion and err by prohibiting [Bennett] from cross-examining Commonwealth witness Jerry Holloman in regard to his involvement in a murder and his role as an immunized Commonwealth witness in the murder case for

_____

[2] 18 Pa.C.S. § 907.

[3] 18 Pa.C.S. § 6108.

the purpose of eliciting testimony showing that Holloman was in a position that inclined him to want to curry favor with the prosecution or avoid displeasing the prosecution as a result of his concerns about his involvement in the other murder case, and therefore had a strong motive to testify falsely in the present case?

Appellant's Brief, at 2.

"The scope of cross-examination is within the discretion of the trial judge, and absent an abuse of that discretion an appellate court will not disturb the trial judge's rulings." *Commonwealth v. Pagan*, 950 A.2d 270, 285 (Pa. 2008) (citing *Commonwealth v. Auker*, 681 A.2d 1305, 1317 (Pa. 1996). "An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion [that] overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Bryant*, 67 A.3d 716, 726 (Pa. 2013) (quoting *Commonwealth v. Eichinger*, 915 A.2d 1122, 1140 (Pa. 2007)).

Consistent with the statement he made to police the day after the murder, Holloman testified at trial that he saw Bennett shoot the victim. He acknowledged that he was testifying under a grant of immunity, and he "understood that to mean that as long as [he] testified in a way [the Commonwealth] agreed with, [he] would never be charged with any crimes or none of the things that [he] might say would ever be used against [him] in a criminal prosecution." N.T. Trial, 4/18/12, at 195. Holloman admitted that he sold marijuana, *id*. at 150, and that he had an open pending theft charge against him for which he had failed to appear, leading to the issuance

- 4 -

of a bench warrant. *Id*. at 144. He also testified that, due to his cooperation with the government in another case, his family had received $16,000 in benefits. *Id*. at 226.

Holloman also testified that at the beginning of the investigation into Young's murder, he maintained that he knew nothing. However, after being detained by the police for thirty-eight hours, he began to talk. *Id*. at 188. He agreed with defense counsel that he had concluded by that point that he was "not going anywhere" until he told the police "what they wanted to hear." *Id*. at 228. He further admitted that if he had not accused someone else, he believed he was going to be arrested for Young's murder. *Id*. at 249-51.

As the above-referenced testimony indicates, the trial court permitted defense counsel several opportunities to challenge Holloman's motives and credibility. However, the trial court refused to allow defense counsel to cross-examine Holloman about a second case in which he testified under a grant of immunity, the murder of Danny Williams by Clarence Burbage, which took place seven months after the murder of Young. On appeal, Bennett argues that the trial court's refusal to allow him to ask "Holloman any questions pertaining to the Williams murder case and his role in the murder and his role as a Commonwealth witness," Appellant's Brief, at 18, was an abuse of discretion and a violation of his right to confrontation under the federal and state Constitutions.

The exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination, based on concerns about, among other things . . . confusion of the issues . . . or interrogation that is repetitive or only marginally relevant. The Confrontation Clause guarantees and opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

***Commonwealth v. Bozyk***, 987 A.2d 753 (Pa. Super. 2009) (citations and quotations omitted).

Significantly, Holloman was never charged with any offense related to the Williams homicide. Accordingly, the trial court's determination not to permit cross-examination on this issue is consistent with ***Commonwealth v. Patterson***, 91 A.3d 55 (Pa. 2014), where our Supreme Court upheld a trial court's ruling that where no criminal charges were ever filed against a witness, he could not be impeached with evidence that he had solicited a murder in order to test his motivation to cooperate with the Commonwealth because of his own vulnerability to prosecution.

Bennett relies on ***Davis v. Alaska***, 415 U.S. 308 (1974), for the general proposition that the Confrontation Clause "mandates that the fact finder see and evaluate a witness's demeanor under cross-examination." Appellant's Brief, at 19. However, an important factual difference exists between ***Davis*** and the present case. In ***Davis***, the trial court erred by

prohibiting impeachment with the fact that the witness who testified that Davis committed a burglary, had himself previously been adjudicated delinquent for burglary and was on probation for that offense. In contrast, the Commonwealth never charged Holloman with any offense related to Williams' death. Accordingly, **Davis** does not compel an opposite result.

In light of the fact that the trial court permitted Bennett to impeach Holloman for bias in connection with the grant of immunity in this case, his open theft charge, the government payments his family received for his cooperation, his insistence he knew nothing about Young's murder until he was detained by police for thirty-eight hours, and his admission that he accused Bennett out of fear he was going to be arrested, the court did not abuse its discretion in prohibiting Bennett from cross-examining Holloman about a homicide that occurred seven months after Bennett's death, and for which Holloman was never charged.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/2015